UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
                                        )
UNITED STATES OF AMERICA                )
                                        )
v.                                      )          No. 21-CR-10120
                                        )
FERMIN CASTILLO,                        )
                Defendant               )
                                        )
_____ )

## DEFENDANT FERMIN CASTILLO'S SENTENCING MEMORANDUM

Now comes the defendant Fermin Castillo, by and through undersigned counsel, and

respectfully submits this Sentencing Memorandum.  Mr. Castillo does not, in any respect, seek to

depreciate or minimize the gravity of his offenses of conviction.  He does, however, seek via this

Sentencing Memorandum to provide the Court with a full, three-dimensional understanding of

the human being whose fate now rests in its hands.

**I.      Personal Background**

As the 15 letters of support attached to this Memorandum attest, Mr. Castillo is far more

than the evidence this Court heard at trial regarding his approximately one-year participation in

drug and money laundering conspiracies.[1]  Those letters bring into sharp focus the person now

facing sentencing before the Court: a devoted son, a caring and supportive family member, a

deeply involved father of four children, and an empathetic and dependable friend to many.  As

detailed in the letters, Mr. Castillo has made a habit of quietly helping those in need (asking for

_____

[1] The defense notes that Mr. Castillo reserves his right (and intends) to appeal his convictions,
but he understands the jury verdict and accepts it for purposes of sentencing.

and expecting nothing in return), steadfastly offered the kind of friendship any person would cherish, and provided an unwavering foundation of support and care to his family, his friends, and many more.  *See, e.g.*, Exhibit 5, Letter of Aneudi Lara (friend of "over 25 years" describing Mr. Castillo as "a fantastic person who is trustworthy, compassionate, and always puts others before himself. . . .  With all my heart, Mr. Castillo is altruistic, kindhearted, and charitable"); Exhibit 6, Letter of Digna Castillo (Mr. Castillo's aunt writing, "I have known Mr. Castillo since birth, and he has always stood out from the rest of the children.  He has always been kind and compassionate and offered a helping hand to any family, friend, or stranger in need. . . .  Anyone who has ever known my nephew can say he is a good man with a good heart"); Exhibit 7, Letter of Jamel Castillo (Mr. Castillo's sister-in-law attesting, "I can say with total confidence that there are few people in this world as kind-hearted, accommodating than Fermin; not just to me but to whomever crosses his path"); Exhibit 8, Letter of Magia Guerrero (Mr. Castillo's aunt saying, "I have seen [Mr. Castillo] grow into a great person. . . .  He has put others first; he makes sure his family and friends are safe and secure, and if they need anything, he is the first one to be there"); Exhibit 14, Letter of Ramon Rodriguez (friend of more than 23 years describing Mr. Castillo as "the true definition to; integrity, strong moral standards, and most of all selflessness").

Mr. Castillo has earned this reputation in both big ways and small.  He is the family member always checking-in to see whether his parents or aunts need anything.  He is the volunteer at a homeless shelter who makes the people he is serving feel like they are true friends. He is the bank customer who dramatically apprehends a would-be bank robber claiming to be armed with a bomb.  He is, simply put, independent of his participation in the events leading to his convictions in this case, an exceptional human being.

2

Mr. Castillo is 43 years old.  PSR ¶ 85.  He was born into relative poverty in Bani, Dominican Republic, where he and his two siblings were raised in a wooden home.  *Id.*  While Mr. Castillo's basic needs were met, life "wasn't easy."  *Id.*  Mr. Castillo's father worked on a ship, causing him to frequently be away from home.  When he was home, about "every few months," Mr. Castillo's father "was often out playing pool or drinking."  PSR ¶ 86.  Mr. Castillo's father moved to the United States when he was just 7 years old.  *Id.*  Three years later, Mr. Castillo's mother followed suit, leaving Mr. Castillo with his paternal grandmother who was also caring for many of his cousins.  *Id.*  Mr. Castillo began working with his grandfather on a farm at the age of 11.  *Id.*

In addition to the hardships of poverty, Mr. Castillo also suffered abuse during his childhood.  He was physically and verbally abused by his mother and his grandmother, as well as other authority figures in the Dominican Republic.  PSR ¶ 87.  For example, Mr. Castillo recalls "his preschool teacher using a big belt on him and other students."  *Id.*  Even more tragically, Mr. Castillo was sexually abused by a neighbor for years.  Mr. Castillo "did not share this abuse with anyone until recently.  He feels that the abuse would have never happened had his dad been present."  *Id.*

At 12 years old, Mr. Castillo moved to Queens, New York and was reunited with his parents.  PSR ¶ 88.  He immediately began work painting houses and at a convenience store to help his family make ends meet.  *Id.*  When Mr. Castillo was 14, his family moved to Massachusetts and opened the La Bamba convenience store in Boston.  *Id.*  Mr. Castillo worked long hours at the store to make the family business a success.  As Mr. Castillo's parents attest, "Our kids began working with us at our small business . . . , juggling their academic and personal

lives as teens.  Fermin was the one who would help us out the most, he would go out of his way to make sure we were not too overworked."  Exhibit 9, Letter of Felix and Nery Castillo; *see also* Exhibit 2, Letter of Darmin Castillo ("Growing up, I witnessed my young dad being a hard working family man.  I remember him always working at the family store with hardly any days off and assisting my grandparents with whatever they needed.").  When Mr. Castillo graduated from high school, "he took on the bigger role of full-time Store Manager and worked long hour days.  He was always either working at the store or running errands for the store and/or his family."  Exhibit 10, Letter of Arelys Furtado.  Mr. Castillo became a United States citizen in April 2000, more than 23 years ago.  PSR ¶ 89.

Also in the year 2000, Mr. Castillo became a father when his son Darmin (22) was born. In 2002, he married Nadiuska Soto, and that marriage produced three more children: Sharina (19), Fermin (13), and Felix (13).  PSR ¶ 92.  Mr. Castillo remains in daily contact with his ex-wife, and they are dedicated co-parents to their three shared children.  "Fermin has always been an astounding father and has always continued to guide, support and encourage his children." Exhibit 1, Letter of Nadiuska Soto.  The mother of Mr. Castillo's first child similarly attests, "I have known Fermin to be a responsible and hardworking, family man since the time we met. . . . Fermin Castillo has always been there for our first-born child and his 3 younger children mothered by his wife.  He has always tried to be present and instill a sense of rightness in his children."  Exhibit 10, Letter of Arelys Furtado.

Notably, even though Mr. Castillo had his eldest son Darmin at the age of just 20, and his relationship with Darmin's mother did not last, Mr. Castillo maintained a consistent, positive involvement in his son's life.  See Exhibit 2, Letter of Darmin Castillo ("Sundays were the one

day when they would close the store a little early so the whole family could enjoy dinner together at our favorite Chinese food restaurant.  To this day, it is still one of my favorite memories and family tradition.  My dad taught me work ethic and discipline from an early age.  During school breaks, he would bring me to the family store and I would assist with simple tasks such as stocking and organizing shelves.  He would also bring me along on trips to the warehouses to purchase items needed to restock the store inventory.").  Mr. Castillo's daughter Sharina paints a similar picture: "My father has never neglected or abandoned my family.  Even throughout the heavy divorce my parents underwent, my father's presence has never failed us.  He has supported my brothers and I immensely, in various ways."  Exhibit 3, Letter of Sharina Castillo.  Mr. Castillo's youngest twin sons describe him as "a man of integrity, kindness, and compassion, always willing to lend a helping hand to those in need.  His unwavering support for our family has been immeasurable, and his dedication to our . . . well being is a testament to his character. . . .  [W]e want to shed light on the person our father truly is–a loving, caring, and devoted parent who has always put his family's well-being above all else.  Growing up, our father has been our hero, role model and best friend.  He has worked tirelessly to provide for our family and has always been there for us, supporting us in all our endeavors.  He has taught us valuable life lessons about integrity, empathy, and the importance of taking responsibility for one's actions."  Exhibit 4, Letter of Fermin and Felix Castillo.

Perhaps most tellingly, Mr. Castillo's dedication to family has not wavered, even in the most difficult time of his life during the pendency of this serious criminal case.  "Not one day, or a couple of hours to be specific, goes by where he is not calling his family to ask if we have eaten, how we are feeling, or just if there is anything we need."  Exhibit 9, Letter of Felix and

Nery Castillo; *see also* Exhibit 6, Letter of Digna Castillo ("To this day, he is still helping others and ensuring that others are well."). Mr. Castillo is in daily contact with both of his parents, who live in Miami, Florida. PSR ¶ 90. His father "recently underwent back surgery and is finishing treatment for cancer." *Id.* Mr. Castillo's brother and sister also live in Miami, where they own a family convenience store. *Id.* Mr. Castillo is in weekly contact with both of them. *Id.*

Mr. Castillo's dedication has extended beyond his immediate family. Mr. Castillo's aunt writes, "as the only one of all my brothers and sister that didn't have the blessing of having children, I can say that Fermin is like a son to me. . . . I consider myself his second mom as he is always in touch with me and ensures that I have everything I need." Exhibit 6, Letter of Digna Castillo. Mr. Castillo, for example, helped his aunt "move from the state of New York to New Hampshire driving the Uhaul." *Id.* A long-time friend who lived with Mr. Castillo and his family for "almost six years" says, "I always felt welcomed, and [Mr. Castillo] always treated m[e] like a brother." Exhibit 12, Letter of Ricky Tejeda. Another friend in the grocery store business recalls that, when he experienced a family emergency and "was in desperate need to travel," Mr. Castillo "immediately offered" to stay and help at the store so his friend could leave. Exhibit 11, Letter of Oscar Dominguez.

As Mr. Castillo's ex-wife explains, "Fermin is simply an immensely optimistic and open-minded man who has never hesitated to help anyone in need. Before we married, when he visited me in the Dominican Republic, we would go together [to] clean up the beaches and surrounding areas in my hometown. . . . In a third world country where there are many children in need to see him give away his own food to others, it was just an unforgettable image that will forever be my vision of him as a human." Exhibit 1, Letter of Nadiuska Soto. A long-time

friend similarly writes, "I am an actor and as part of my community service hours we drove to downtown Miami and I helped [Mr. Castillo] give away food from his family business to the homeless.  Fermin used to prepare individual plates for the homeless at least twice a week." Exhibit 5, Letter of Aneudi Lara.  Mr. Castillo also provided "sweaters and comforters" during the winter.  *Id.*  But Mr. Castillo was more than just a volunteer – he had "friends" at the homeless shelter who "as soon as they saw his vehicle approached him."  *Id.*; *see also* Exhibit 13, Letter of Angel Suazo (describing Mr. Castillo as a "wonderful member of our community, especially those from his native town in the Dominican Republic[ t]o whom he has provided the less fortunate with medicine, food and other things").  Even when he was just a child, Mr. Castillo's aunt remembers him helping to "give out bread and hot chocolate to the church community," and pushing his grandfather in a wheelchair.  *See* Exhibit 8, Letter of Magia Guerrero.

Perhaps most dramatically, in 2011 Mr. Castillo "put his life on the line by saving a bank from being robbed in Dorchester."  Exhibit 3, Letter of Sharina Castillo.  "Without hesitating [Mr. Castillo] held the m[a]n in custody until they called the police and prevented the bank from being robbed. . . .  He was recognized by the Boston Police Department and the FBI for his courageousness."  Exhibit 7, Letter of Jamel Castillo.  According to a Boston Police Incident Report, attached hereto as Exhibit 16, officers arrived on the scene to find Mr. Castillo inside the ATM "vestibule struggling with the bank robbery suspect."  There was "money spread around on the floor" of the vestibule.  *Id.*  Mr. Castillo later explained to officers that he had been using the coin machine when "he saw the suspect walk into the bank with his hood up. . . .  [H]e saw the suspect at the teller window and . . . saw him shaking."  *Id.*  Mr. Castillo "knew the bank was

being robbed and when the suspect started to leave the bank he followed him to stop him." *Id.* Mr. Castillo "struggled with the suspect" and held him at bay using a pocket knife. *Id.* Mr. Castillo persisted until officers arrived, even when the "suspect yelled that he had a bomb." *Id.* One bank teller corroborated Mr. Castillo's account, telling officers that "she heard the suspect screaming 'I've got a bomb strapped to me, you don't have to be a hero. Why are you doing this?'" *Id.* The Assistant Manager similarly "heard the commotion and the suspect yelling 'get off me, I have a bomb.'" *Id.*

The defense submits that this incident speaks volumes about the type of person that Mr. Castillo is. He personally had nothing to lose by simply allowing the suspect to walk out of the bank with the money. Indeed, that is unquestionably what most of us would do in that situation. But not Mr. Castillo. At great personal risk to himself, he intervened to stop the crime. And Mr. Castillo refused to relent, even when the suspect threatened him with a bomb. This was an exceptionally selfless act by a special person.

In sum, Mr. Castillo has, over the course of his four decades of life, consistently shown a unique ability to be a positive presence and lift others up. One friend of over 16 years writes, "Any time Fermin's name is brought up, there is nothing but exceptional things said about him. He is humble and appreciates the little things life has to offer; you never see him without a smile on his face. Even in dark times, he has yet to give up and has always remained positive." Exhibit 11, Letter of Oscar Dominguez.

## II.      Statutory Sentencing Range and Sentencing Guideline Calculation

For reasons set forth in detail in a prior filing, the defense contends that the 15-year mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A)(vi) does not apply. *See* Dkt. 302.

Accordingly, the statutory sentencing range is 0 to 20 years pursuant to 21 U.S.C.

§ 841(b)(1)(C).

As this Court has repeatedly held, the Constitution requires that all facts increasing the guideline sentencing range ("GSR") potentially applicable to a defendant be found by the jury beyond a reasonable doubt. *See, e.g.*, *United States v. Abraham*, 498 F. Supp. 3d 175, 180 (D. Mass. 2020) (Young, J.) ("[A] judge may not impose a sentence higher than is supported by the facts found by a jury."); *United States v. West*, 552 F. Supp. 2d 74, 88 (D. Mass. 2008) (Young, J.) ("It is . . . the *jury* which, in our present quasi-determinant sentencing structure, ought establish the upper limit to a constitutionally reasonable sentence."); *United States v. Tejeda*, 550 F. Supp. 2d 204, 207 (D. Mass. 2008) (Young, J.) ("Since the spring of 2004, . . . this Court has been following the emerging constitutional rule that whenever the government identifies a fact, other than a prior conviction, that warrants deprivation of a defendant's liberty or an increase in that deprivation, such fact must be proven to a jury beyond a reasonable doubt if not admitted by the defendant." (citation omitted)).

    a.  *Drug quantity*

It follows that Mr. Castillo's drug-quantity enhancement is Constitutionally capped at the 32 levels corresponding to the quantity of fentanyl (1.2 to 4 kilograms) found by the jury. *See* Dkt. 240 at 3; U.S.S.G. § 2D1.1(c)(4). The government's attempt to hold Mr. Castillo accountable for between 12 and 36 kilograms overlooks the fact that the jury specifically declined to attribute even 4 to 12 kilograms to him. *See* Dkt. 240 at 3.

Even setting aside the foregoing Constitutional limit, which should be dispositive, the jury had good reason to reject the government's attempts to attribute larger quantities of fentanyl

to Mr. Castillo.  As defense counsel argued in summation, some of the fentanyl seized from 800 Hyde Park Avenue was labeled with other names having no apparent connection to Mr. Castillo (*e.g.*, "Chile" and "Camille").  May 23, 2023 Tr. 71.  Even assuming *arguendo* that other co-defendants, some of whom (unlike Mr. Castillo) were present daily at 800 Hyde Park Avenue, may be accountable for larger drug quantities, this Court instructed the jury that it must find beyond a reasonable doubt how much Mr. Castillo personally was "accountable for," meaning that he "kn[ew] what was going on."  May 23, 2023 Tr. 118; *see also United States v. Gonzalez-Arias*, 946 F.3d 17, 26 n.5 (1st Cir. 2019) (noting that defendant may only be held accountable for drug quantities "that were reasonably foreseeable by him and were committed in furtherance of the conspiracy" (citation omitted)).  The jury reasonably concluded that this amount was between 1.2 and 4 kilograms.

Moreover, the government's effort to convert every dollar allegedly attributable to Mr. Castillo in this case into additional amounts of fentanyl must be rejected.  As an initial matter, this cash conversion was never argued to the jury.  And there is no reasonable basis to assume that every dollar at issue represents fentanyl proceeds.  Indeed, Mr. Castillo was charged with conspiracy to distribute fentanyl ***and cocaine***.  *See* Dkt. 212, Count One; PSR ¶¶ 7, 11, 12, 37 n.4 (repeatedly alleging that Mr. Castillo's co-defendants were distributing cocaine).  "Although the sentencing court may rely on reasonable estimates and averages in arriving at its drug-quantity determinations, their probable accuracy must be founded on adequate indicia of reliability and demonstrable record support."  *United States v. Rivera-Maldonado*, 194 F.3d 224, 228 (1st Cir. 1999) (citations omitted).  Where, as here, "drug quantity has a dramatic leveraging effect, special care must be taken to ensure that particularized drug-type quantity findings are

10

predicated on reliable information and, where significant uncertainty exists, that those findings err on the side of caution." *Id.* at 233 (citation omitted). Because the government has failed to provide any "discernible quantitative breakdown among the [two] controlled substances dispensed" by the alleged drug trafficking organization at issue here, it cannot simply assume that the entire amount of money represents proceeds from fentanyl sales. *Id.* Certainly, the proof on this issue falls far short of the beyond a reasonable doubt standard applied by this Court.

The Addendum to the PSR's response to the defense objection on this issue is, by contrast, predicated upon an inapplicable preponderance of the evidence standard. Moreover, respectfully, the assertion that "the primary drug possessed/distributed" by the charged conspiracy "was fentanyl," Response to Objection #14, falls short of the "particularized findings or discernible record support" required for drug quantity enhancements. *Rivera-Maldonado*, 194 F.3d at 233. By definition, a conclusion that fentanyl was the "primary" drug distributed precludes any finding that fentanyl sales generated ***all*** of the conspiracy's proceeds. In fact, the search of 800 Hyde Park Avenue resulted in seizure of cocaine, in addition to fentanyl.

b. *Organizer/leader*

Like the government's proposed drug-quantity enhancement, the organizer or leader enhancement here is unsupported by an applicable jury finding. This is because the verdict form, pursuant to which the jury found that Mr. Castillo was an "organizer or leader of criminal activity," did not specify the nature of the criminal activity to which it referred (*i.e.*, the drug distribution conspiracy or the money laundering conspiracy). Dkt. 240 at 3. The money laundering guideline, however, requires that any adjustment on this ground "be determined based on the offense covered by this guideline (i.e., the laundering of criminally derived funds) and not

11

on the underlying offense from which the laundered funds were derived." U.S.S.G. § 2S1.1,
application notes. Respectfully, the government could and should have identified this issue for
the Court if it wanted to enhance Mr. Castillo's sentence on this basis. Its failure to do so, and
the resulting lack of a jury finding that Mr. Castillo acted as an organizer or leader of the money
laundering conspiracy, should preclude application of this enhancement.

In any event, even overlooking the foregoing defect, the trial evidence was insufficient to
support the enhancement.[2] Restricting the inquiry to the money laundering conspiracy, as
required by the application notes, the trial evidence failed to identify five or more criminally
culpable "participants" in that activity. *See* U.S.S.G. § 3B1.1(a). The PSR states that Mr.
Castillo was "one of eight participants responsible for the criminal activity," presumably in
reference to the eight defendants charged in connection with this case. PSR ¶ 68. But two of
those individuals, Saturnino Guerrero and Kevin Hayes, were not convicted of, or shown to have
been involved in, any alleged money laundering conspiracy. PSR ¶ 4. Two others, Songfeng
Chen and Chi Ying, were charged with money laundering conspiracy, but there was no trial
evidence regarding either, precluding a jury finding that they were culpable participants in Mr.
Castillo's criminal activity.

In response to the foregoing, the Addendum to the PSR takes the position that a
defendant's role in the offense "is to be determined o[n] the basis of all conduct within the scope
of §1B1.3 (Relevant Conduct), and not solely on the basis of elements and acts cited in the count

---

[2] The jury's finding that Mr. Castillo was an organizer or leader does not bind the Court. *See
West*, 552 F. Supp. 2d at 89 n.8 ("*Below* the upper limit of a constitutionally reasonable sentence
(established by jury fact finding or the defendant's admissions during a plea), I make
determinations of a factual nature upon which the actual sentence is based.").

of conviction." Response to Objection #15. Respectfully, this reliance on relevant conduct in the face of § 2S1.1's application notes is contrary to the weight of persuasive authority, and First Circuit dicta. *See, e.g.*, *United States v. Arellanes-Portillo*, 34 F.4th 1132, 1139 n.11 (10th Cir. 2022) ("[B]y instructing that any Chapter Three adjustments *not* be determined based on relevant conduct for the offenses underlying the money-laundering offenses, § 2S1.1's Application Note 2(C) seals off drug-offense relevant conduct from the money-laundering calculation for Chapter Three adjustments."); *United States v. Salgado*, 745 F.3d 1135, 1138 (11th Cir. 2014) ("Th[e] application note's meaning . . . is straightforward: When the district court calculated [defendant's] offense level under § 2S1.1(a)(1), it could base a role enhancement on his conduct in the money laundering conspiracy but not on his conduct in the underlying drug conspiracy."); *United States v. Torres-Landrua*, 783 F.3d 58, 66 n.10 (1st Cir. 2015) ("assuming, without deciding, that the focus" for assessing defendant's entitlement to a minor role reduction "should have been on the money laundering activity instead of the drug activity"); *United States v. Cruzado–Laureano*, 440 F.3d 44, 49 (1st Cir. 2006) ("[A]plication note 2(C) to the money-laundering guideline provides that Chapter Three adjustments should be determined with reference to the money-laundering *offense* and not to the underlying offense."). Reliance on the general guideline provision regarding relevant conduct in this context "overlooks the first three words of § 1B1.3, which tell courts that it defines the defendant's relevant conduct '[u]nless otherwise specified.' Application Note 2(C) . . . does specify otherwise." *Salgado*, 745 F.3d at 1140 (citation omitted).

Additionally, this enhancement requires evidence that the defendant "exercised some degree of authority or control over another criminal *actor*." *United States v. Rivera*, 51 F.4th 47,

52-53 (1st Cir. 2022).  Here, there was only evidence of the contents of Mr. Castillo's communications with one alleged co-conspirator, government cooperator Mr. Castro.  And, during the charged conspiracy spanning March 2020 to March 23, 2021, the trial evidence, predominantly Mr. Castro's own testimony, depicted Mr. Castillo and Mr. Castro as relative equals.  *See, e.g.*, May 17, 2023 Tr. 140 (Q: "Whose idea[] was that?"  A: "Our idea, Fermin and I."); May 18, 2023 Tr. 12 (Q: "Whose Cherokee was it?"  A: "Ours, Fermin's."); May 19, 2023 Tr. 42 ("[T]he business was not just mine, the business was both of ours.  We would work together."); May 22, 2023 Tr. 24 (Q: "And how did the clients . . . get your number?"  A: "They called Fermin or me.").  Mr. Castro expressly conceded in his trial testimony that he, not Mr. Castillo, was responsible for directing the other two principal participants in the charged money laundering conspiracy.  *See* May 19, 2023 Tr. 79-80 ("My nephew [Andre Heraux] I would send out to run errands.  Fermin didn't know about that.  I was the one that sent him out.  Same with Kevin [Carmona].  I was the one that sent them out.").

c.  *Maintaining drug premises*

Finally, the government seeks to impose a 2-level enhancement on the grounds that Mr. Castillo "maintained a premises for the purpose of manufacturing or distributing a controlled substance."  U.S.S.G. § 2D1.1(b)(12).  The only arguable basis for this enhancement apparent from the PSR is the allegation that "the lease to" 800 Hyde Park Avenue was "connected to" Mr. Castillo.  PSR ¶ 33.  The trial evidence on this point consisted of conclusory testimony that a phone allegedly used by Mr. Castillo had contacted an individual affiliated with "Aspen Properties," and that Aspen "was the property manager for 800 Hyde Park Ave."  May 22, 2023 Tr. 130.  But, as reflected in the Affidavit of John Cinotti (a licensed private investigator and

former Postal Inspector for 21 years), attached hereto as Exhibit 17, Aspen is not the manager of

that property, nor was it at any time relevant to this case.  Mr. Cinotti, unlike the officer who

provided contrary testimony at trial, explains how he reached that conclusion.  Mr. Cinotti

visited the address and found another property manager's, Brigs LLC, sign next to the door.

Exhibit 17 ¶ 3.  He then contacted that property manager to obtain contact information for its

predecessor, Premier Property.  *Id.*  A representative of Premier Property subsequently informed

Mr. Cinotti that it had managed 800 Hyde Park Avenue from November 2015 through November

2021, *i.e.* during the entirety of the charged conspiracy.  *Id.* ¶ 4.  In light of the foregoing, the

government has failed to connect Mr. Castillo to the lease of the apartment beyond a reasonable

doubt.

      Moreover, there was insufficient evidence connecting the phone number (ending in 6448)

that was purportedly in contact with Aspen to Mr. Castillo.  Rather, the government's argument

on this point was circular: Mr. Castillo was allegedly using the 6448 number to contact "the

phone for the property manager of 800 Hyde Park Ave.  Castro's . . . phone also had contact with

this property manager."  May 23, 2023 Tr. 58.  Respectfully, the mere fact that the 6448 number

and Mr. Castro were both in contact with a number purportedly belonging to Aspen does not

meaningfully suggest that the 6448 number belonged to Mr. Castillo, especially given the lack of

any apparent connection between Aspen and 800 Hyde Park Avenue.

      In any event, event crediting the PSR's assertions on this issue, 800 Hyde Park Avenue

was "Castro's residence."  PSR ¶ 13.  There was no evidence that investigators ever physically

observed Mr. Castillo at that location, and the PSR specifically alleges that he was residing

abroad during the relevant timeframe.  PSR ¶ 8.  In these circumstances, Mr. Castillo's alleged

connection to the premises falls well short of that at issue in prior cases where the First Circuit

has affirmed application of this enhancement.  *See United States v. Melendez-Rosado*, 57 F.4th

32, 38 (1st Cir. 2023) ("[T]he record is pellucid that the defendant rented the apartment . . . and

resided in it with his two children."); *United States v. Soto-Villar*, 40 F.4th 27, 35 (1st Cir. 2022)

("[T]he court supportably found that the defendant rented the apartment."); *United States v.*

*Jones*, 778 F.3d 375, 385 (1st Cir. 2015) ("[defendant]—and no one else—kept clothes and

toiletries" at apartment).  Here, by contrast, someone else (namely Mr. Castro) resided in and had

daily access to the premises.  And Mr. Heraux and Mr. Carmona also had frequent access to the

apartment, far more so than Mr. Castillo who was out of the country for the vast majority of the

charged conspiracy.

### III.    A Sentence of 120 Months' Incarceration Would Be Fair, Just, and Sufficient to Meet the Sentencing Goals Set Forth in 18 U.S.C. § 3553(a)

As in all sentencing proceedings, this Court is tasked with imposing a punishment that is

"sufficient, ***but not greater than necessary***" to serve the enumerated statutory goals.  18 U.S.C.

§ 3553(a) (emphasis added).  Among other things, the Court should consider the nature and

circumstances of the offense; the defendant's individual circumstances; sentences imposed and

to be imposed on his co-conspirators, and, in the discretion of the Court, on other defendants in

similar cases; and what degree of incarceration will satisfy the goals of sentencing.

As this Court is fully aware, Supreme Court and First Circuit precedents confer broad

discretion to determine the appropriate sentence in individual cases.  *See, e.g.*, *Gall v. United*

*States*, 552 U.S. 38 (2007); *United States v. Thurston*, 544 F.3d 22, 25-26 (1st Cir. 2008)

(affirming "dramatic" downward variance under *Gall*).  No longer are district courts bound by

the strictures of the guidelines or even permitted to presume that the applicable guideline range is

reasonable. *See Gall*, 552 U.S. at 49-50. Rather, "once the GSR is properly calculated, sentencing becomes a judgment call for the court, and the court may construct a sentence varying from the GSR based on a complex of factors whose interplay and precise weight cannot even be precisely described." *United States v. Innarelli*, 524 F.3d 286, 292 (1st Cir. 2008) (citation omitted), *superseded on other grounds*. Moreover, under *Kimbrough v. United States*, 552 U.S. 85 (2007), courts are free to deviate from the guidelines even where doing so "contravenes a broad policy pronouncement of the Sentencing Commission." *United States v. Politano*, 522 F.3d 69, 74 (1st Cir. 2008) (citation omitted); *see also, e.g.*, *United States v. Vanvliet*, 542 F.3d 259, 271 (1st Cir. 2008) (relying on *Kimbrough* for proposition "that district courts legitimately may cite their own disagreements with Guidelines policy as justification for imposing a below-Guidelines sentence").

In the circumstances of the present case, the defense respectfully submits that a sentence of 120 months' imprisonment is "sufficient, but not greater than necessary" to serve § 3553(a)'s sentencing goals. Alternatively, if the Court, contrary to the defense argument, finds that the 15-year mandatory minimum sentence applies, the defense respectfully requests that it impose that sentence.

a. *Downward variance to avoid penalizing Mr. Castillo's exercise of his Constitutional right to trial*

At the outset, the defense respectfully requests that this Court vary downward from the otherwise applicable GSR to avoid penalizing Mr. Castillo for the exercise of his Constitutional right to a jury trial. Assuming this Court agrees with the guideline calculation set forth above, Mr. Castillo's total offense level is 34. For his criminal history category, that corresponds to a GSR of 188-235 months. Had Mr. Castillo pled guilty to the very same offenses he was

convicted of at trial, his GSR would be dramatically reduced to 135-168 months. As this Court has recently held, such "strikingly disparate sentencing ranges (which do not even come close to overlapping) simply do not square with the statutory mandate – 'sufficient, but **not greater than necessary**' (emphasis supplied) – where the Commission counsels that the huge bulk of similarly situated defendants ought be sentenced within the lower range." *Abraham*, 498 F. Supp. 3d at 185. Accordingly, the defense submits that the Court should treat the lower GSR (135-168 months) as that determined by the Commission to be sufficient but not greater than necessary for the average defendant convicted of Mr. Castillo's offenses.

      b.   *History and characteristics of the defendant*

For the majority of his life, beginning at the age of just 11, Mr. Castillo has been a hard-worker, dedicating long hours to legitimate pursuits in the hopes of providing for his family. Along the way, he was blessed with a full life, including four loving children. Mr. Castillo's son Darmin remembers his father working tirelessly in his family's convenience store to make ends meet.

As set forth above, Mr. Castillo has also shown himself, through deeds not words, to be a person of uncommon generosity and selflessness. Many of the glowing letters from family members and friends strike remarkably similar chords in describing who Mr. Castillo is: the type of person who would go out of his way to help anyone in need, whether a parent, child, aunt, friend, or complete stranger. The type of person who would interrupt a mundane errand, and risk his own personal safety, to stop a would-be bank robber – with nothing to gain and everything to lose by doing so.

According to the jury verdict, at some point, Mr. Castillo took the easy way out. In the

approximately one-year period of the charged conspiracies, he strayed from the values that he has embodied for most of his life, the values that he teaches his children: hard-work, selflessness, empathy, and compassion for others. But the jury's finding of criminal misconduct, serious though it was, does not, alone, define Mr. Castillo. It does not undo the good that Mr. Castillo has done for countless others. Mr. Castillo is, like all of us, a human being, who deserves to be judged by the totality of his actions, including both the good and the bad.[3]

Additionally, as reflected in the sentencing letters, many of Mr. Castillo's friends and family members will suffer greatly during his period of incarceration. The toll on Mr. Castillo's young twins is particularly tragic. In their own words, "the thought of our father being separated from our daily life due to incarceration is heartbreaking. The bond between a father and a son is irreplaceable, and we rely on his guidance, love, and support to navigate the challenges of life." Exhibit 4, Letter of Fermin and Felix Castillo.

While a significant period of incarceration is unavoidable given the nature of Mr. Castillo's convictions, the defense respectfully requests that the Court weigh the foregoing circumstances in considering a further downward variance from the applicable GSR.

c. *Circumstances of offense*

While the defense, once again, does not seek to understate in any respect the seriousness of the offenses for which Mr. Castillo stands convicted, it must, to provide necessary context for the Court, expose certain accusations by the government that are utterly unsupported by the trial

---

[3] Mr. Castillo notes that, while it does not excuse his offenses of conviction, he has long struggled with substance abuse. He "was surrounded by substance use and always felt better while using substances." PSR ¶ 101. Mr. Castillo has been a user of cocaine, heroin, and fentanyl, in addition to alcohol and marijuana. PSR ¶ 100.

record.  Sentencing determinations must be based upon evidence with "sufficient indicia of

reliability to support its probable accuracy." *Torres-Landrua*, 783 F.3d at 64 (citation omitted).

Even facts included in the PSR, where an objection is raised, must possess an "adequate

evidentiary basis."  *United States v. Carrion-Melendez*, 26 F.4th 508, 513 (1st Cir. 2022)

(citation omitted) (holding that district court abused its discretion by considering allegation that

was "multiple-level hearsay . . . made by an unnamed source" which was "not detailed" and

"uncorroborated").  The evidence in this case focused on the role allegedly played by Mr.

Castillo, and others, in certain deliveries of drug proceeds.  There was no evidence whatsoever

regarding the operations of any "Sinaloa, Mexico based DTO,"[4] nor that Mr. Castillo

"coordinated the importation of drugs from Mexico and elsewhere."  PSR ¶ 8.  The defense

respectfully submits that the Court should reject this nefarious innuendo and evaluate Mr.

Castillo's offense conduct based upon the testimony and exhibits introduced at trial.

    d.  *Disparities among defendants*

        i.  Co-defendants in this case

Section 3553(a)(6) specifically directs sentencing judges to consider "the need to avoid

unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct."  *See also United States v. Robles-Alvarez*, 874 F.3d 46, 52 (1st Cir.

---

[4] The only mention of this location in the trial record is the evidence, introduced via a law
enforcement witness, of a single "$1,000 money transfer to Sinaloa, Mexico" sent by Mr. Castro
in 2019 (years before the alleged beginning of the charged conspiracy).  May 23, 2023 Tr. 10.
Of course, this relatively modest transfer, in isolation, falls far short of establishing any Sinaloa-
based conspiracy.  And the mere fact that the transfer was sent to a specific part of the same
"country" in which the prosecutor stated Mr. "Castillo was residing" does nothing to
meaningfully connect him to that transaction.  *Id.* at 52.  Notably, the government declined to ask
Mr. Castro, its own cooperating witness, about the recipient or purpose of this transfer.

2017) (explaining that this subsection is "primarily aimed at national disparities," but "also permits consideration of disparities among co-defendants" (citation omitted)).

Here, this Court has, thus far, sentenced three of Mr. Castillo's co-defendants. Those sentences have ranged from one day time-served to 60 months, exactly one-half of the sentence the defense requests here. Kevin Carmona, the defendant sentenced to 60 months, was one of two primary couriers for the money deliveries, according to the trial evidence. The government argued at Mr. Carmona's sentencing hearing that he was an integral part of the conspiracy, who delivered hundreds of thousands of dollars and was present at the stash house daily. The Court nonetheless imposed a sentence more than 44% below the low end of the GSR (108 months). Saturnino Guerrero was sentenced to an incarcerative term of 57 months. Mr. Guerrero was "intercepted numerous times over Castro's phone ordering drugs (often half kilogram quantities)." PSR ¶ 37. Kevin Hayes received one day time-served, notwithstanding the fact that investigators seized more than 100 grams of fentanyl, 115 Clonazepam tablets, 51 Alprazolam tablets, $6,000 cash, and three phones from his home. *See* PSR ¶ 43.

While the defense understands the government's argument that Mr. Castillo played a more significant role in the conspiracy than any of the foregoing co-defendants, it respectfully submits that an incarcerative sentence double that of the next highest co-defendant, or triple in the event the Court finds the 15-year mandatory minimum sentence applicable, is sufficient to account for any differences in culpability and that any further increase would result in an unwarranted disparity.

Mr. Castro, the government's cooperating witness, who, as set forth *supra* 14, testified to being a relatively equal participant with Mr. Castillo in the criminal activity for which he stands

convicted, has not yet been sentenced, but will predictably benefit from a government motion to avoid the applicable statutory minimum (which the government contends is 10 years), *see* 18 U.S.C. § 3553(e), and GSR, *see* U.S.S.G. § 5K1.1.

      ii.  Other defendants with comparable offense conduct

A 120-month sentence would also be consistent with, and frankly more severe than, sentences imposed on similarly situated defendants in this District and elsewhere.

According to the Sentencing Commission's Interactive Data Analyzer, over the past five years (2018-2022), the median incarcerative sentence imposed for trafficking fentanyl for defendants in Mr. Castillo's criminal history category is 60 months nationwide and 33 months in this District. *See* United States Sentencing Commission, Interactive Data Analyzer, *available at* https://ida.ussc.gov/analytics (last visited Nov. 20, 2023). For the entire period for which data is available (going back to 2015), Judges in this District have varied downward from the applicable GSR more than 55% of the time in fentanyl trafficking cases, including more than 48% of the time without a government motion. *See id.* By contrast, only about 28% of offenders were sentenced within or above range. *See id.*

Other Judges of this Court, and elsewhere, have imposed less significant custodial sentences for offense conduct comparable to, or even more egregious than, that at issue here:

| Case | Sentence | Summary |
|------|----------|---------|
| *United States v. Fajardo*, No. 22-CR-10149-NMG (D. Mass.) | 96 months | Defendant was arrested with over 50,000 counterfeit oxycodone pills containing approximately 7 kilograms of fentanyl. Additionally, law enforcement seized from defendant's apartment an industrial pill press, molds for pharmaceutical grade oxycodone pills, approximately 1.5 kilograms of fentanyl powder, 4 kilograms of mixing agent, and 50 rounds of .40 caliber ammunition. *See* Dkt. 3- |

| | | 2 at 5-6; Dkt. 30 at 1-2. |
|---|---|---|
| *United States v. Johnson*, No. 22-CR-10103-LTS (D. Mass.) | 90 months | Defendant was part of a large, violent DTO that trafficked over 30 kilograms of fentanyl in hundreds of thousands of pills. *See* Dkt. 71 at 1. Defendant worked directly with the head of the DTO and possessed and used multiple firearms, including an AR-15, fully automatic Glock 17, multiple large caliber revolvers, and a number of pistols equipped with large-capacity magazines, to threaten rival drug dealers and cultivate the DTO's reputation. *See id.* at 4-5. Defendant was involved in multiple violent offenses committed on behalf of the DTO, including an attempted armed robbery. *See id.* at 14-15. |
| *United States v. Valentine*, No. 21-CR-00112 (D. Conn.) | 72 months | Defendant ran major DTO in Connecticut and trafficked approximately 25 kilograms of fentanyl and 6 kilograms of cocaine. *See* Dkt. 169 at 1. In a search of defendants' properties, law enforcement located $700,000 in drug proceeds, fentanyl, heroin, cocaine, and multiple firearms. *See* Dkt. 9 at 9-10. |
| *United States v. Tejeda-Lara*, No. 22-CR-10280-LTS (D. Mass.) | 54 months | Search of defendant's home and vehicle yielded approximately 9 kilograms of fentanyl and three firearms. *See* Dkt. 1-1 at 3-4. |

Just weeks ago, Judge Talwani sentenced a defendant who was convicted of the same offenses as Mr. Castillo: "conspiracy to possess[] with intent to distribute 400 grams or more of fentanyl and cocaine, . . . and conspiracy to launder money." *See United States v. Larios*, No. 21-CR-10118 (D. Mass.), Dkt. 226 at 1 (government sentencing memo). The defendant in that case, touted by the government as the largest fentanyl prosecution ever in this District, was "the leader of a massive drug trafficking organization that distributed truckloads of fentanyl and cocaine." *Id.* at 7. He was responsible for the delivery of 17 kilograms of fentanyl to a cooperating witness in a single transaction. *See id.* at 2. He subsequently arranged another 6-kilogram delivery. *See id.* at 4. The defendant was thus responsible for 23 kilograms of fentanyl

from these two transactions alone, between roughly six and twenty times that for which the jury held Mr. Castillo responsible here (1.2 to 4 kilograms).  A "loaded .9mm Beretta handgun and 16 boxes of ammunition" were recovered from the defendant's "bedside nightstand," and search of his office yielded "a loaded Glock .22 caliber handgun" from his desk.  *Id.* at 6.  A total of 33 cellphones were recovered from the defendant's home and workplace combined.  *See id.*  The defendant's GSR was 210-262 months.[5]

Judge Talwani ultimately imposed an incarcerative term of 180 months (or 15 years), varying downward from the low end of the guidelines by 30 months (14%).  Respectfully, in the event the Court finds that the 15-year mandatory minimum sentence applies here, any incarcerative term beyond that would result in an unwarranted disparity as compared to Mr. Larios and the other defendants noted in the chart above.  While the defense acknowledges that Mr. Castillo, unlike Mr. Larios, has a prior serious drug conviction on his record, that aggravating factor is more than offset by the significantly larger quantity of fentanyl involved in Mr. Larios's case, as well as his possession of two firearms.

e.  *120 months is sufficient but not greater than necessary*

Confinement for 10 years is a gravely serious sentence that appropriately reflects the serious nature of Mr. Castillo's convictions.  It is sufficient but not greater than necessary to not only send a powerful message to Mr. Castillo, but also to all others that they will receive a significant jail sentence if they commit similar conduct.  This is particularly so given the likelihood that Mr. Castillo's offense of conviction will render him ineligible to reduce his

---

[5] Notably, had Mr. Larios simply exercised his Constitutional right to trial rather than pleading guilty, his total offense level would have been 40, yielding a GSR of 292-365 months.

24

sentence by participation in First Step Act programming.  *See* 18 U.S.C. § 3632(d)(4)(D).  In

essence, Mr. Castillo is likely to serve nearly all the time that this Court imposes.  By the time he

is eligible for release, Mr. Castillo's two oldest children will have full lives of their own, and his

twins are likely to be finished with college.

      Importantly, Mr. Castillo has never before served any sentence even remotely

comparable to the 10 years (or 15 if the mandatory minimum applies) that the defense requests

here.  While Mr. Castillo has a prior felony conviction from 2012, he served approximately 28

months for that offense.  *See* PSR ¶ 76.  There is every reason to believe that the exponentially

longer sentence he will now serve will send a profound message to Mr. Castillo (and other

would-be offenders), more than adequate to deter any future criminal misconduct.  *See, e.g.*,

Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006)

("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent

effects."); *United States v. Lara*, No. 95-CR-75, 2023 WL 2305938, at *11 (D.R.I. Mar. 1, 2023)

("Long sentences . . . do not necessarily deter crime effectively.  As Daniel Nagin—a professor

at Carnegie Mellon University and a leading national expert on deterrence—has written:

'Increases in already long prison sentences, say from 20 years to life, do not have material

deterrent effects on crime.'" (citation omitted)); *United States v. Rainone*, 468 F. Supp. 3d 996,

1000 (N.D. Ill. 2020) (noting that defendant had "already served eleven years between his state

and federal sentences for burglary and possession of a gun, and the marginal deterrent value of

keeping [him] incarcerated for another eight years [wa]s minimal").

      The risk of re-offense is further reduced by Mr. Castillo's age.  By the time he is released,

if the Court adopts the defense recommendation, he will be about 53 years-old (58 in the event

the Court applies the 15-year mandatory minimum).  Offenders in their 50s are less than half as likely to reoffend as those under 30.  *See* United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* at 22 (Dec. 2017) (reflecting recidivism rates of 26.8% and 64.8%, respectively), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.

Finally, as the letters attached to this Memorandum vividly illustrate, upon his release, Mr. Castillo will unquestionably "have all the family support to get back to our society and continue to be the excellent father, brother, hardworking man" that his friends and family know him to be.  Exhibit 7, Letter of Jamel Castillo.

## IV.    Conclusion

For all the foregoing reasons, the defense respectfully submits that a sentence of 120 months' confinement is a fair and just sentence, and no more than necessary given all the pertinent facts and circumstances.  Furthermore, Mr. Castillo respectfully requests that this Honorable Court recommend that he be allowed to participate in the RDAP program during his incarceration.

Respectfully Submitted,
FERMIN CASTILLO
By His Attorneys,

**/s/ Michael Pabian**
Michael Pabian, Esq.
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

**/s/ Oriosto Medrano Santana**
Oriosto Medrano Santana, Esq.
Forensico LLP
1330 Beacon Street, Suite 300
Brookline, MA 02446
(617) 519-0604
ottomedrano@yahoo.com

Dated: November 22, 2023

## CERTIFICATE OF SERVICE

I, Michael Pabian, hereby certify that on this date, November 22, 2023, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Michael Pabian**
Michael Pabian, Esq.